UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AHMAD MINES FNP-C,
THE INSTITUTE OF
MULTIDIMENSIONAL MEDICINE,

Plaintiffs,

v.

METAGENICS, INC.,

Defendant.

Civil Action No. 22-3789 (JEB)

**MEMORANDUM OPINION**

Defendant Metagenics, Inc. is a supplier of nutritional health supplements. One of its customers, The Institute of Multidimensional Medicine (TIMM), brought suit last year claiming that Metagenics breached its contract with TIMM regarding the sale of certain supplements. This Court granted Defendant's Motion to Dismiss in October 2022.

TIMM and its owner, nurse practitioner Ahmad Mines, have returned with a new suit, again asserting an assortment of contract-related causes of action that vary to different degrees from the original claims. Not surprisingly, Metagenics again moves to dismiss. The Court will grant the Motion as to most but not all causes of action.

**I.   Background**

As in its prior Opinion, at this stage, the Court "accept[s] the facts as alleged in the Complaint as true." Inst. of Multidimensional Med. v. Metagenics, Inc. (Metagenics I), No. 22-1308, 2022 WL 10440101, at *1 (D.D.C. Oct. 18, 2022). The summary that follows assumes familiarity with that Opinion's more detailed history of the dispute. Id. at *1–2. For simplicity, the Court will refer to Plaintiffs jointly as TIMM.

1

Metagenics produces nutritional health supplements and sells them to entities like TIMM, a local nurse practitioner's office. See ECF No. 1 (Compl.), ¶¶ 1, 8. Those practitioners, which the parties sometimes refer to as "practitioner-customers," then resell Metagenics supplements "to their end-user patients" in person or through a website the practitioner runs. Id., ¶ 3. Metagenics also pays practitioners a commission for any purchases end-users make on Metagenics.com using that practitioner's code. Id., ¶¶ 4–5. Defendant advertises the supplements as "practitioner exclusive" on its website and supplement labels, and it does not permit practitioners to sell the supplements on third-party websites like Amazon. Id., ¶¶ 6–7.

TIMM contracted to sell supplements as a practitioner-customer of Metagenics back in 2011. Id., ¶¶ 9–10. After selling the supplements for nearly a decade, TIMM realized that Metagenics had started selling those same supplements directly to end-users on Amazon, without requiring any practitioner code. Id., ¶ 15. To TIMM's surprise, Metagenics was letting other Amazon sellers do the same. Id., ¶ 19. "Seeking to mitigate losses incurred as a result of the pandemic, and because Defendant and others were already selling on Amazon," TIMM "reached out to Defendant's local representative to ask" whether it, too, could sell "Metagenics products on Amazon to [its] end-user patients." Id., ¶ 21. After "Defendant's representative for the mid-Atlantic region," Tom Southward, told TIMM during a meeting that its Amazon sales "would not be an issue," Plaintiffs opened shop on Amazon. Id., ¶¶ 22–23.

Unfortunately for TIMM, those sales were enough of an issue for Metagenics to cancel its contract with TIMM "unilaterally without any advance notice." Id., ¶ 24. When Plaintiffs "promptly ceased selling on Amazon and notified Defendant in writing of their compliance with" its no-Amazon-sales rule, Metagenics never answered. Id., ¶ 28. Since TIMM's patients could no longer purchase Metagenics supplements from TIMM, they began to buy directly from

Metagenics — and TIMM received no commission on those sales because it no longer had a valid practitioner code. Id., ¶ 30.

In July 2022, TIMM filed a Complaint that advanced seven contract-related causes of action against Metagenics. This Court, however, dismissed that lawsuit in its entirety, finding that TIMM had not pled sufficient factual allegations to support any of its counts. See Metagenics I, 2022 WL 10440101, at *2, *6. About a month later, Plaintiffs filed this new lawsuit, which lists four counts: (i) breach of the express and implied warranties of merchantability, (ii) breaches of contract, (iii) breach of the duty of good faith and fair dealing, and (iv) unjust enrichment. See Compl., ¶¶ 32–130. Metagenics now moves to dismiss this new Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). See ECF No. 5 (MTD) at 1.

## II.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a claim for relief when the complaint "fail[s] to state a claim upon which relief can be granted." In evaluating a motion to dismiss, the court must "treat the complaint's factual allegations as true and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks and citation omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (internal

quotation marks omitted).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," but the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555–56 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the pleadings, see Fed. R. Civ. P. 12(d), which includes statements adopted by reference as well as copies of written instruments joined as exhibits.  See Fed. R. Civ. P. 10(c).  Documents that a defendant attaches to a motion to dismiss are "part of the pleadings" under Rule 10(c) if they are integral to its claim, they are referred to in the complaint, and their authenticity is undisputed.  See Kaempe v. Myers, 367 F.3d 958, 965 (D.C. Cir. 2004); Hinton v. Corrs. Corp. of Am., 624 F. Supp. 2d 45, 46–47 (D.D.C. 2009).  The court may consider such materials on a motion to dismiss without treating the motion "as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); Marshall v. Honeywell Tech. Solutions, Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008).

**III.   Analysis**

In considering Metagenics's Motion to Dismiss, a reader might wonder why Defendant does not invoke issue or claim preclusion in light of TIMM's ostensibly similar prior lawsuit.  See Drake v. FAA, 291 F.3d 59, 66 (D.C. Cir. 2002) ("[A] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (quoting Allen v. McCurry, 449 U.S. 90, 94 (1980)) (emphasis omitted); Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987) (ruling on motion to dismiss is "a ruling on the merits with *res judicata* effect").  It turns out, however, that this was a sound strategy, because TIMM's newest Complaint is sufficiently different from its last to warrant a fresh

analysis. The Court addresses each count separately before concluding with Metagenics's ancillary request to remove Mines as a plaintiff.

> A.  Count I: Breach of Express and Implied Warranties of Merchantability

Count I alleges that Defendant breached express and implied warranties of merchantability when it sold TIMM supplements labeled as "practitioner exclusive" even though they no longer were, since Metagenics and others were simultaneously selling directly to end-users on Amazon. See Compl., ¶¶ 47–51, 60.

An express warranty is a promise "made by the seller to the buyer which relates to the goods," D.C. Code § 28:2-313(1)(a), and an implied warranty guarantees that, among other things, the goods will "conform to the promises or affirmations of fact made on the container or label." Id. § 28:2-314(2)(f). "Alleging a breach of either express or implied warranty requires a plaintiff to show 'not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained.'" Metagenics I, 2022 WL 10440101, at *5 (quoting D.C. Code § 28:2-314 cmt. 13).

This Court dismissed TIMM's previous warranty-based causes of action on two independent grounds. First, it found that no actionable warranty existed because the definition of a "warranty" that TIMM proposed — which the Court recognized as "widely accepted" — implicated a promise concerning only "the character, quality, or title of goods," not "the manner of the sale of a product." Id. (internal quotation marks and record citation omitted). Second, the Court found that TIMM failed to allege that it had timely notified Metagenics of the alleged breach. Id. (citing D.C. Code § 28:2-607(3)(a)). Defendant argues for dismissal once again on these same two grounds, adding in a third: TIMM has not properly alleged that it experienced

any harm as a result of the alleged breach. See MTD at 4–7. Because the Court finds that the first and third grounds for dismissal are persuasive, it refrains from addressing the second.

  First, TIMM has not plausibly pled that the practitioner-exclusive label formed a warranty of merchantability. Plaintiffs' Complaint again defines a warranty as "a statement or representation, made by a seller of goods as a part of a contract of sale, concerning the character, quality, or title of goods." Compl., ¶ 34. This time, TIMM further pleads that Defendants' "practitioner exclusive" labeling and advertising constituted a promise that the supplements would be of "medical quality." Id., ¶¶ 44, 46 (emphasis added). But that general attempt to equate the supplements' "practitioner-exclusive" label with their "character [or] quality" falls flat. On its face, the label describes the sales channel, and not the goods themselves, as exclusive. As this Court has explained, that is not enough. See Metagenics I, 2022 WL 10440101, at *5; D.C. Code § 28:2-313(1)(a) (defining express warranty as promise that "relates to the goods" and not their manner of sale); cf. Enter.-Laredo Assocs. v. Hachar's, Inc., 839 S.W.2d 822, 831 (Tex. App.), writ denied, 843 S.W.2d 476 (Tex. 1992) (denying warranty claim that centered on "the basis on which [a] charge was to be calculated and did not relate to the character, quality, or title of the leased space which was the subject of the agreement").

  In their Opposition, Plaintiffs argue — without citation — that "in the highly-regulated medical industry, the channel of sale absolutely speaks to the character and quality of the goods at issue." ECF No. 8 (Opp.) at 4. This conclusory sentence cannot save their Complaint because Plaintiffs do not say what, if any, quality of good the "practitioner-exclusive" label guarantees. Plaintiffs do not allege, for example, that supplements sold exclusively through practitioners are of higher quality or potency. Without more, the practitioner-exclusive label amounts at most to a

6

promise that the goods will reach consumers a certain way and makes no promises about their character, quality, or title.

TIMM's Opposition also cites to a provision of the D.C. Code that defines an implied warranty as promising more broadly that the "[g]oods to be merchantable . . . conform to the promises or affirmations of fact made on the container or label if any." Id. at 5 (quoting D.C. Code § 28:2-314(2)(f)). TIMM appears to imply, but never actually argues, that this statutory language refers to any promises made on a label even if those promises are about the channel of sale and not the goods. Plaintiffs, however, do not explain how to square this theory with their definition of a warranty that covers only "the character, quality, or title of goods." Compl., ¶ 34. As TIMM has failed to plausibly allege that the "practitioner-exclusive" promise constituted an express or implied warranty, this count must be dismissed.

Second, even assuming that Metagenics breached a warranty of merchantability, the Court agrees with Defendant that "TIMM has failed to plead any plausible injuries that were caused by the alleged breach." MTD at 7. "In an action based on breach of warranty," a plaintiff must show "that the breach of the warranty was the proximate cause of the loss sustained." D.C. Code § 28:2-314 cmt. 13 (implied warranties); see Frese v. City Segway Tours of Washington, 249 F. Supp. 3d 230, 237 (D.D.C. 2017) (requiring showing of the "damages caused by breach" of an express warranty) (citation omitted). While Plaintiffs do clearly allege that Metagenics's ultimate cancellation of the contract damaged TIMM, they do not explain how its mere sale to TIMM of supplements that were no longer practitioner exclusive caused Plaintiffs any harm. TIMM makes only the conclusory assertion that it "has experienced significant economic loss and damage to [the] business because of Defendant's breach of warranty." Compl., ¶ 54. While the Court can think of otherwise persuasive theories that might link that loss to the purported

7

breach, Plaintiffs do not advance any. They do not, for example, allege that they paid a higher price for the supplements than they would have if they had known the supplements were no longer exclusive to practitioners. Nor do they allege that they lost market share and thus incurred financial losses as a result. They do not even allege that their clients thought less of them because they were selling goods that were no longer practitioner exclusive, or even that they fielded a single patient inquiry about the supplements' availability on Amazon.

Although TIMM elsewhere alleges that "Defendant's misrepresentations and breach of contract have put the continuity of care of Plaintiff's patients in jeopardy; caused reputational damage to Plaintiff; and completely destroyed the benefit of the bargain for Plaintiff," id., ¶ 29, those "conclusory statements" do not link any damage to the fact that the supplements were no longer exclusive to practitioners. See Iqbal, 556 U.S. at 678. The Court will therefore dismiss this count for the independent reason that Plaintiffs have not plausibly pled that the alleged breach of a warranty caused them any harm.

B. Count II: Breaches of Contract

Count II includes three distinct claims for breach of contract. Such claims in the District of Columbia contain four elements: "[A] party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." Metagenics I, 2022 WL 10440101, at *4 (quoting Brown v. Sessoms, 774 F.3d 1016, 1024 (D.C. Cir. 2014)).

TIMM's breach-of-contract cause of action in the prior lawsuit advanced a general allegation that Metagenics "fail[ed] to adhere to the direct terms of [Metagenics's] agreement" with TIMM concerning Amazon sales, but the Court found that it "fail[ed] to identify a provision of the contract that Defendant violated." Id. (internal quotation marks and record citation

omitted). TIMM returns with three independent breach-of-contract claims. It alleges that Defendant breached: (1) the notice provision of its Internet Policy when it failed to provide 10 days' notice or at least a chance to come into compliance before terminating Plaintiffs' account, see Compl., ¶¶ 67–88, (2) an oral modification of that Policy's prohibition on Amazon sales, see id., ¶¶ 89–98, and (3) an implied-in-fact contract to sell Plaintiffs "practitioner exclusive" products. Id., ¶¶ 100–110. The Court takes each in turn.

1. *Breach of Notice Provision*

TIMM first alleges that when it contracted to resell Defendant's supplements, an accompanying Internet Policy "specified that a practitioner in violation of Defendant['s] policies would 'receive ten (10) days' advance written notice from [Defendant] that they are in violation of the Policy and therefore will no longer be able to purchase the [supplements] after the end of the ten (10) day notice period." Id., ¶ 67. Although Defendant admittedly "reserved the right to modify" the Policy and had since modified it to remove that 10-day provision, Plaintiffs also contend that (1) the revised policy retains a requirement to provide some notice, id., ¶¶ 82–83, and (2) TIMM "should not be bound by the new terms that do not provide for 10 days' notice or a guarantee of reactivation." Id., ¶¶ 72–73.

Metagenics's Motion to Dismiss raises a threshold issue: has TIMM plausibly alleged that its contract with Defendant incorporated the terms of the Internet Policy, whether in its revised form or not? See MTD at 8–9. TIMM's Complaint alleges that Defendant "required that [TIMM] agree to the" Policy when it "signed up for [its] practitioner-Consumer account." Compl., ¶ 10. And this time, it attaches to the Complaint a copy of a model "New Account Application" form that requires prospective practitioner-customers to check a box that "acknowledge[s] that [they] have received Metagenics Policies." ECF No. 1-2 (Exh. B)

9

(emphasis omitted). Defendant rejoins that Plaintiffs still must plead "how the internet policy forms a contract with" it and must "provide a copy of any contract between [TIMM] and Metagenics." MTD at 8–9 (emphasis added). The Complaint need not go so far.

Plaintiffs have plausibly alleged that Defendant requires practitioners to agree to its Internet Policy in exchange for signing on as practitioner-customers. As neither party has provided the Court with the full language of the contract TIMM signed — which TIMM argues "is in the possession of Defendant," Opp. at 6 n.1 — the reference to an Internet Policy in the model Application form is enough at this stage to allege that the contract incorporated an "obligation or duty" that both parties would adhere to that Policy's terms as part of their contract. Brown, 774 F.3d at 1024. As the discussion that follows will demonstrate, the Policy on its own terms also "set[s] forth specific procedures that both the [practitioners] and [Metagenics] must follow" with respect to internet sales, which further supports the conclusion that it demonstrates both parties' intent to be bound by it. Doe v. Am. Univ., No. 19-3097, 2020 WL 5593909, at *11 (D.D.C. Sep. 18, 2020).

A second issue lurks beneath the first: which version of the Internet Policy applies? Metagenics argues that TIMM was bound by its revised policy, see MTD at 10–11, and TIMM counters that it cannot be bound by a revision to the Policy of which it was not properly notified. See Opp. at 7–8. At this stage, however, Plaintiffs have plausibly alleged that either version of the Policy required Metagenics to provide practitioners suspected to have breached its terms with some notice and to offer them "at least one opportunity to" comply with Metagenics's Internet Policy. See Compl., ¶ 83; MTD at 12 (quoting revised Policy's statement that practitioners "who violate this Policy will receive notice from Metagenics that they are in violation of the Policy").

Given that TIMM alleges that Metagenics terminated the contract with <u>no</u> notice, it has sufficiently alleged a breach.

In defense of its termination without notice, Metagenics last points to statements in each policy that describe a "zero-tolerance approach regarding enforcement." MTD at 14 (quoting original Policy); <u>see id.</u> at 13 ("Metagenics reserves the right to not sell or supply products to any practitioner-Customer who sells Metagenics products on third-party sites.") (quoting original Policy); <u>id.</u> at 14 (quoting similar sentence in revised Policy). Those statements merely clarify that Metagenics will not make an <u>exception</u> to its no-Amazon-sales rule and are consistent with its obligation to provide notice and an opportunity to conform before cracking down.

As Metagenics implicitly acknowledges elsewhere in its Motion, Plaintiffs have also sufficiently pled the damages caused by this breach. See MTD at 18 ("[T]he only damages that TIMM alleges appear to relate to Metagenics terminating TIMM's account . . . ."). TIMM alleges that it "promptly ceased selling on Amazon" after its account was terminated, <u>see</u> Compl., ¶ 28, and that Metagenics's cancellation of its contract without notice "hurt Plaintiff[s] financially" and "put the continuity of care of [TIMM's] patients in jeopardy." <u>Id.</u>, ¶¶ 25, 29. Plaintiffs' notice-based contract claim may therefore proceed.

2. *Breach of Orally Modified Contract*

TIMM's next breach-of-contract claim alleges that in a January 12, 2022, meeting, Defendant's representative Tom Southward "modified" or "waived" the Policy's prohibition on practitioner Amazon sales "and assured Plaintiff[s] that it would be permissible for TIMM to sell the products on Amazon." Compl., ¶ 98. The Court agrees with Defendant that TIMM means to allege that its contract was orally modified, and TIMM does not dispute that characterization. <u>See</u> MTD 15; Opp. at 9. Both parties concur that for this oral-modification theory to survive

dismissal, Southward must have plausibly held the apparent authority to modify the terms of the contract.  See MTD at 15–16; Opp at 9.  That is because "to be effective, the mutual oral agreement must be by the original parties to the agreement or someone authorized" or apparently authorized "to act in their stead."  Mgmt. P'ship, Inc. v. Crumlin, 423 A.2d 939, 941 (D.C. 1980).

Defendant's only argument for dismissal here is that TIMM "has not ple[d] sufficient facts to support a claim that Southward had the apparent authority to modify" the ban on Amazon sales "by oral agreement — i.e., that a reasonable person would believe that Metagenics had consented to Southward's exercise of that power."  MTD at 16.  The crux of Defendant's position is that Southward, a "regional sales representative," could not plausibly have acted with the apparent authority to "modify a well-known company-wide practice" prohibiting practitioners from selling the supplements on websites like Amazon.  Id.  That demands too much at this juncture.  Plaintiffs have alleged that Southward is "the point of contact for practitioner-Customers in the [mid-Atlantic] region," and that at a meeting to discuss the terms of their agreement, he told Plaintiffs that "it would not be an issue" if they sold on Amazon.  See Compl., ¶ 95 (emphasis added); id., ¶¶ 21–22.  This suffices.

It is correct, as Defendant points out, that Plaintiffs do not specifically allege that Southward made similar modifications to any other term of their contract with Metagenics, see MTD at 16, and Plaintiffs do not allege that they knew about any such modifications to the contracts of other customers at the time.  Southward's alleged level of responsibility plus the contract-focused purpose of the meeting, combined with the allegation that "Defendant and others were already selling on Amazon" before the meeting occurred, see Compl., ¶ 21, are nonetheless enough to make out a plausible claim that he led Plaintiffs "to reasonably believe

[Metagenics] had consented to [his] exercise of authority" to make them an exception. See Crumlin, 423 A.2d at 941 (quoting Feltman v. Sarbov, 366 A.2d 137, 139 (D.C. 1976)). Nor does Defendant identify any allegations that would contradict or undermine that conclusion. TIMM's claim for a breach of an oral modification to the contract therefore survives dismissal.

### 3. *Breach of Implied Contract*

Plaintiffs identify a third and final breach, this time of an implied-in-fact contract. Here, they allege that Defendant contracted to sell TIMM "practitioner-exclusive" supplements and then breached that contract when it sold TIMM supplements that "were available on third party websites from non-practitioner sellers, including Defendant." Compl., ¶¶ 107–08. Metagenics maintains that this allegation should be dismissed on two grounds. First, because it already entered an express contract with Plaintiff, Defendant argues that the Court cannot "displace an existing agreement and . . . impose new duties that were not mutually agreed to by the parties in the original agreement." MTD at 18. It next contends that even if TIMM has properly pled this claim, it has not adequately pled the damages it suffered as a result. See id.

As the Court agrees with the latter position, it passes on the former. As it explained in Part III.A, *supra*, Plaintiffs have not adequately pled what damages were caused by their purchase of non-exclusive supplements from Metagenics. Rather, they provide only a conclusory statement that they "experienced a significant economic loss and damages to [the] business due to Defendant's breach of implied contract." Compl., ¶ 109. According to Metagenics, TIMM should have instead "explain[ed] how it suffered these damages" because without such an explanation, the only plausible damages were those caused by Defendant's ultimate cancellation of its contract with TIMM and not by its mere sales of non-exclusive supplements. See MTD at 18. Typically, "the lack of detail in the complaint is not a basis for

13

dismissing a claim for damages at this early stage of the litigation as plaintiffs are under no obligation to plead damages with particularity." Democracy Partners v. Project Veritas Action Fund, 285 F. Supp. 3d 109, 126 (D.D.C. 2018); see also Opp. at 11. But here, as the Court described in dismissing Count I, Plaintiffs have wholly failed to allege — let alone with particularity — that they lost customers or sales or incurred reputational damage from other sellers' Amazon activity. See, e.g., Compl., ¶ 21 (mentioning only "losses incurred as a result of the pandemic"). The Court therefore dismisses TIMM's implied-in-fact contract claim.

### C. Count III: Breach of Duty of Good Faith and Fair Dealing

TIMM next alleges that Metagenics breached an implied covenant of good faith and fair dealing. In the District of Columbia, that occurs when "the party to a contract evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." Allworth v. Howard Univ., 890 A.2d 194, 201 (D.C. 2006) (quoting Paul v. Howard Univ., 754 A.2d 297, 310 (D.C. 2000)).

In its prior Opinion, the Court dismissed TIMM's claim that Metagenics breached any such duty. Metagenics I, 2022 WL 10440101, at *4. This time around, TIMM alleges that "Defendant promised that its products were 'practitioner exclusive'" and was "unfaithful to the contract" when it sold its products on Amazon and permitted other non-practitioners to do so. See Compl., ¶¶ 115, 121–22.

Defendant argues that TIMM "still has not identified any provision of a contract between it and Metagenics that defines the term 'practitioner exclusive' or that otherwise conditions performance on Metagenics selling exclusively to practitioners' offices." MTD at 19; see also Reply at 10. The Court agrees. In any event, as it has explained above, even if such a contract existed, Plaintiffs have failed to adequately plead that a breach of such a duty caused them any

harm. See, e.g., Compl., ¶ 123 (mentioning in conclusory fashion "the significant damage caused to Plaintiff[s'] business due to the breach of the duty of good faith and fair dealing"). This count must therefore be dismissed. See Paul, 754 A.2d at 311 (dismissing implied-covenant count where plaintiff advanced "conclusory allegation" that University's actions caused her to "relinquish equal employment opportunities") (internal quotation marks omitted).

### D.  Count IV: Unjust Enrichment

TIMM last alleges that Defendant unjustly enriched itself by selling supplements to Plaintiffs' patients after they could no longer use TIMM's practitioner code. See Compl., ¶¶ 127–28. It is unclear whether TIMM had previously referred these patients to Metagenics's website while the contract was operative. Id. Last time, TIMM alleged a vaguer formulation of this unjust-enrichment count, which the Court dismissed on the ground that "allegations of an express contract warrant 'dismissal of an unjust enrichment claim at the motion-to-dismiss stage.'" Metagenics I, 2022 WL 10440101, at *5 (quoting United States ex rel. Purcell v. MWI Corp., 254 F. Supp. 2d 69, 79 (D.D.C. 2003)).  As Metagenics acknowledges, that ground for dismissal does not apply to Plaintiffs' refashioned unjust-enrichment claim, which turns on events that took place after the parties' contract was terminated. See MTD at 20.  The Court therefore turns to the elements of the cause of action.

"Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." Peart v. D.C. Hous. Auth., 972 A.2d 810, 813 (D.C. 2009) (quoting News World Commc'ns, Inc. v. Thompsen, 878 A.2d 1218, 1222 (D.C. 2005)).  Defendant argues that this cause of action cannot survive because "it was not unjust for Metagenics to fulfill the orders of [TIMM's] patients who were left empty-handed as a result of [TIMM's]

15

misconduct." MTD at 21. It adds that TIMM has failed to "clearly articulate what actual benefit it conferred on Metagenics" because "simply referring someone to another's website . . . is not the type of benefit that . . . triggers a claim of unjust enrichment." Id.

Plaintiffs do not attempt to counter either of these points and instead offer "[t]hreadbare recitals of the elements" of an unjust-enrichment claim, "supported by mere conclusory statements." Iqbal, 556 U.S. at 678; see Opp. at 12 ("Plaintiff plead[ed] sufficient facts for an unjust enrichment claim."). That is not enough. "To recover on a theory of unjust enrichment[,] . . . the plaintiff must show that the defendant was unjustly enriched at his expense." Pernice v. Bovim, No. 15-541, 2015 WL 5063378, at *7 (D.D.C. Aug. 26, 2015) (quoting News World Commc'ns, Inc., 878 A.2d at 1222) (emphasis added and cleaned up). Here, Plaintiffs allege that when they directed their patients to the Metagenics website, they conferred the "benefit" of new sales and commission-free profit on those sales to Metagenics. See Compl., ¶ 128. Once its practitioner-customer account was terminated, however, TIMM had nothing to gain from those end-users. This is because it was no longer permitted to sell Metagenics supplements to end-users anyway. Nor can this count serve as a back door to relitigate Plaintiffs' allegations that Metagenics breached its contract with TIMM when it deactivated the account. This final count will therefore be dismissed.

  E. Mines as a Plaintiff

A final housekeeping matter is in order. Metagenics argues that TIMM has improperly included its owner Mines as an independent Plaintiff and that Mines should therefore be dismissed. See MTD at 21–22. As Metagenics points out, the Complaint repeatedly refers to TIMM as the "Plaintiff" in this action, see, e.g., Compl., ¶ 8, and excludes Mines from the attached civil cover sheet. See ECF No. 1-1 (cover sheet). Because District of Columbia law

draws "no legal distinction between the identity of a sole proprietorship and its owner," the parties agree that Mines could in theory bring suit in his own name. See Opp. at 12 (quoting de Sousa v. Embassy of Rep. of Angola, 267 F. Supp. 3d 163, 170 (D.D.C. 2017)); Reply at 12–13. TIMM's Opposition does not explain how it benefits either Plaintiff to have both the sole proprietor and his legally indistinguishable proprietorship named as separate plaintiffs. See York Grp., Inc. v. Wuxi Taihu Tractor Co., 632 F.3d 399, 403 (7th Cir. 2011) ("A proprietorship is just a name that a real person uses when doing business; it is not a juridical entity."). In any event, because Metagenics has not shown that this duplicative arrangement is prejudicial to it, the Court will at this juncture and pending further exploration of the issue permit Mines to remain as Plaintiff.

### IV.    Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting Defendant's Motion to Dismiss in part and denying it in part. Only Count II's notice- and oral-modification-based claims may proceed.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: April 13, 2023