UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AHMAD MINES FNP-C;
THE INSTITUTE OF
MULTIDIMENSIONAL MEDICINE,

Plaintiffs,

v.

METAGENICS, INC.,

Defendant.

Civil Action No. 22-3789 (JEB)

## MEMORANDUM OPINION

The Institute of Multidimensional Medicine (TIMM) and its owner, Ahmad Mines, have twice brought suit against Defendant Metagenics for breaching their contract regarding the sale of nutritional health supplements. This Court dismissed the first suit in October 2022 and granted in part a motion to dismiss the present suit in April 2023. Before the parties embark on discovery in earnest on what remains, Plaintiffs seek leave to amend their Complaint. The proposed amendments would revive some already-dismissed theories of liability, give others a facelift, and introduce still more brand-new causes of action. With the exception of one new claim, the Court will deny the Motion as futile.

I.  Background

As in its prior Opinions, at this stage, the Court "accept[s] the facts as alleged in the Complaint as true." Inst. of Multidimensional Med. v. Metagenics, Inc. (Metagenics I), 635 F. Supp. 3d 6, 10 (D.D.C. 2022). The following abbreviated factual overview covers only the basics and borrows heavily from the Court's prior Opinions. For simplicity, the Court will refer to Plaintiffs jointly as TIMM.

1

Metagenics produces nutritional health supplements and sells them to entities like TIMM, a nurse practitioner's office here in Washington, D.C. See ECF No. 1 (Compl.), ¶¶ 1, 8. Those practitioners then resell Metagenics supplements "to their end-user patients" in person or through websites they run. Id., ¶ 3. Metagenics also pays practitioners a commission for any purchases end-users make on Metagenics.com using that practitioner's code. Id., ¶¶ 4–5. Defendant does not permit practitioners to sell the supplements on third-party websites like Amazon. Id., ¶¶ 6–7.

TIMM contracted to sell supplements as a practitioner-customer of Metagenics back in 2011. Id., ¶¶ 9–10. It did so by filling out an online form that requires applicants to check a box "acknowledg[ing] that [they] have received Metagenics Policies." ECF No. 1-2 (Model Application Form); see Compl., ¶ 10. After selling the supplements for nearly a decade, TIMM realized that Metagenics had started selling those same supplements directly to end-users on Amazon. See Compl., ¶ 15. To TIMM's surprise, Metagenics was also letting other supplements sellers do the same. Id., ¶ 19. "Seeking to mitigate losses incurred as a result of the pandemic, and because Defendant and others were already selling on Amazon," TIMM "reached out to Defendant's local representative to ask" whether it, too, could sell "Metagenics products on Amazon to [its] end-user patients." Id., ¶ 21. After "Defendant's representative for the mid-Atlantic region," Tom Southward, told TIMM during a meeting that its Amazon sales "would not be an issue," Plaintiffs opened shop on Amazon. Id., ¶¶ 22–23.

Unfortunately for TIMM, those sales were enough of an issue for Metagenics to cancel its contract with TIMM "unilaterally without any advance notice." Id., ¶ 24. When Plaintiffs "promptly ceased selling on Amazon and notified Defendant in writing of their compliance with" its no-Amazon-sales rule, Metagenics never answered or renewed the business relationship. Id., ¶ 28. Since TIMM's patients could no longer purchase Metagenics supplements from TIMM,

they began to buy directly from Metagenics — and TIMM received no commission on those sales because it no longer had a valid practitioner code. Id., ¶ 30. This lost revenue is the motivating force behind the lawsuits.

In April 2022, TIMM filed its initial action against Metagenics in District of Columbia Superior Court, and Defendant swiftly removed it to federal court. Metagenics I, No. 22-1308, ECF Nos. 1 (Notice of Removal), 1-2 (Original Complaint). After Plaintiffs amended their Complaint, this Court dismissed the first lawsuit in its entirety without prejudice, finding that TIMM had not pled sufficient factual allegations to support any of its counts. See Metagenics I, 635 F. Supp. 3d at 12–15. About a month later, Plaintiffs filed this new lawsuit, which listed four counts: (I) breach of the express and implied warranties of merchantability, (II) breaches of contract, (III) breach of the duty of good faith and fair dealing, and (IV) unjust enrichment. See Compl., ¶¶ 32–130. In response to a defense motion, the Court dismissed all but portions of Count II in April 2023. See Mines v. Metagenics, Inc. (Metagenics II), 2023 WL 2930557, at *8 (D.D.C. Apr. 13, 2023). Recently, it issued a scheduling order governing discovery, which allowed until September 1, 2023, for the parties to amend their pleadings. See ECF No. 22 (Scheduling Order). TIMM filed for leave to amend its Complaint on that day. See ECF No. 25 (Motion). The proposed Amended Complaint lists the surviving portions of their breach-of-contract claim as Count I and adds four new counts, which it lists as Counts II–V. See ECF No. 25-1 (Amended Complaint), ¶¶ 25–88. Metagenics opposes the Motion. See ECF No. 26 (Defendant's Opposition).

**II.     Legal Standard**

A plaintiff may amend her complaint once as a matter of course within 21 days of serving it or within 21 days of being served a responsive pleading. See Fed. R. Civ. P. 15(a)(1).

Otherwise, she must seek consent from the defendant or leave from the court.  See Fed. R. Civ. P. 15(a)(2).  "The court should freely give leave when justice so requires."  Id.  In deciding whether to grant leave to file an amended complaint, the court may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  Foman v. Davis, 371 U.S. 178, 182 (1962).  In this Circuit, "it is an abuse of discretion to deny leave to amend unless there is sufficient reason."  Firestone v. Firestone, 76 F.3d 1205, 1208 (D.C. Cir. 1996).  Furthermore, under Rule 15, "the non-movant generally carries the burden in persuading the court to deny leave to amend."  Nwachukwu v. Karl, 222 F.R.D. 208, 211 (D.D.C. 2004).

It is clear, however, that amendment should not be permitted if it would be futile.  In other words, if the proposed amendment would be deficient, the court need not grant leave.  See In re Interbank Funding Corp. Sec. Litig., 629 F.3d 213, 218 (D.C. Cir. 2010) ("[A] district court may properly deny a motion to amend if the amended pleading would not survive a motion to dismiss."); James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss.").

**III.   Analysis**

As all but one of the new counts do not pass legal muster, the Court begins with futility. Because TIMM's fraudulent-inducement claim is adequately alleged, however, the Court goes on to consider Defendant's undue-delay and prejudice arguments as to that count alone.

A.  Futility

TIMM's proposed additions to the Complaint comprise four counts: (1) breach of contract relating to Metagenics's Internet Policy and Customer Policy (Count II); (2) breach of the duty of good faith and fair dealing (Count III); (3) violation of the D.C. Consumer Protection Procedures Act (Count IV); and (4) fraudulent inducement (Count V).  See Am. Compl., ¶¶ 62–88.  The Court addresses each in sequence.  In so doing, it assumes that the facts alleged in the proposed Amended Complaint are true.

1.  *Count II: Breach of Contract*

Count II alleges that Metagenics breached two separate policies incorporated by reference into the parties' original contract by selling its own products directly on Amazon.  As to the first of these — the Internet Policy — the Court discerns no difference between the new allegations and those it rejected in its first Opinion dismissing TIMM's claims.  As to the second — the Customer Policy — the proposed Amended Complaint does not adequately allege its incorporation into the parties' contract.

Start with the Internet Policy.  It contains many provisions, but the relevant part states that "Metagenics does not authorize or permit sales of its . . . products on third-party-facilitated sites," including Amazon.  See ECF No. 25-4 (Policy Documents) at 2.  The Court already rejected a claim of breach based on this portion of the Policy in Metagenics I.  It reasoned that under the Policy's plain meaning, "it is customers, not Defendant, who are prohibited from selling Metagenics products on third-party platforms."  Metagenics I, 635 F. Supp. 3d at 13. Metagenics's own sales on Amazon are thus within bounds.

Seeking to evade that clear holding, Plaintiffs take language from the Court's most recent decision out of context and offer it as a basis for resuscitation.  Explaining why the Internet

5

Policy as a whole was binding on the parties, the Court wrote in Metagenics II that "the Policy on its own terms . . . sets forth specific procedures that both the practitioners and Metagenics must follow with respect to internet sales." Metagenics II, 2023 WL 2930557, at *5 (cleaned up); see ECF No. 27 (Plaintiffs' Reply) at 12 (citing this language). TIMM's reliance on this general statement rather than the Court's earlier, more specific determination is too clever by half. The Court's conclusion that the Internet Policy's third-party-sites restriction imposed no duty on Defendant is as true today as it was a year ago. Realleging this claim would therefore prove futile.

TIMM would seem to fare better with its claim for breach of the so-called Customer Policy, which states that "[t]o ensure proper use of [Metagenics's] high quality nutraceuticals, we only sell to licensed healthcare professionals." Policy Documents at 1 (emphasis added). This Policy, unlike the third-party-sites restriction just discussed, appears to block Defendant's ability to sell to whomever it pleases.

That is not the end of the analysis, however. Metagenics submits that "Plaintiffs include no facts, and never allege[] when this Customer Policy was introduced . . . [or] whether it was included as part of [its] contract with Plaintiffs." Def. Opp. at 15. In response, TIMM points to its allegation that it "submitted an application via Defendant's website, which included acknowledgement of electronic 'Metagenics Policies.'" Pl. Reply at 12 (citing Am. Compl., ¶ 13). TIMM also correctly notes that this Court found that very check-box acknowledgment sufficient to establish at this stage that the "contract incorporated an 'obligation or duty' that both parties would adhere to [the Internet] Policy's terms as part of their contract." Metagenics II, 2023 WL 2930557, at *5; Pl. Reply at 12.

Unfortunately for TIMM, there is a piece missing from the Customer Policy allegations that was not an issue with the Internet Policy. Namely, the Amended Complaint never alleges that the Customer Policy was actually in effect at the time Plaintiffs applied to sell Metagenics supplements. TIMM has, conversely, always alleged that the Internet Policy was in effect at the time of contracting. See Compl., ¶¶ 11–13 (describing content of policy at that time); Am. Compl., ¶¶ 28–31 (same). The Customer Policy receives no such temporal treatment in the Amended Complaint. Nor does the copy of the policy appended to the Amended Complaint contain an effective date; rather, it appears to have been accessed online in July 2023. See Policy Documents at 1. By contrast, the Internet Policy states that it became effective in 2008, years before the parties first contracted in 2011. See Compl., ¶ 9; Policy Documents at 2. Because no inference that the Policy existed at the relevant time can be drawn, the cause of action for its breach would not withstand a motion to dismiss either.

2. *Count III: Breach of Duty of Good Faith and Fair Dealing*

Turning to the duty of good faith and fair dealing, Plaintiffs allege breach on three bases: (1) "Metagenics sold its professional line of products directly to the consumer on Amazon.com"; (2) its "agent authorized Plaintiffs' selling of the [Metagenics's] products on Amazon.com, then Metagenics terminated the contract for them doing so"; and (3) "Metagenics failed to reactivate Plaintiffs' account upon receiving notice of their cure of the alleged violation of the Internet Policy." Am. Compl., ¶ 73.

The Court can quickly dispense with the first purported instance of bad faith — *viz.*, Defendant's direct-to-consumer sales. Since neither the Internet Policy nor the Customer Policy imposed a duty on Defendant, TIMM has not homed in on a contractual provision that "conditions performance on Metagenics selling exclusively to practitioners' offices."

Metagenics II, 2023 WL 2930557, at *7.  As this Court has previously ruled, that fact is fatal to a good-faith-and-fair-dealing cause of action.  See Metagenics I, 635 F. Supp. 3d at 13–14 ("Just as TIMM has not alleged facts to show that Metagenics made actionable misrepresentations or breached its contract, it has similarly not sufficiently pled that Defendant has evaded the spirit of the contract, willfully rendered imperfect performance or interfered with the other party's performance.") (cleaned up).

TIMM's second and third contentions under Count III are based on the contract claims that this Court previously found to be adequately alleged.  Metagenics II, 2023 WL 2930557, at *5–6; see Am. Compl., ¶ 73(b), (c).  Specifically, per the Court's earlier ruling, Plaintiffs were permitted to move forward in what is now Count I with: (1) their claim that Defendant did not honor an oral modification to the contract allowing them to sell the supplements on Amazon; and (2) their claim that Metagenics breached by neglecting to provide written notice that TIMM had violated its policies and an opportunity to cure prior to terminating the parties' contract.  Metagenics II, 2023 WL 2930557, at *5–6.

Whereas the practitioner-exclusivity portion of Count III lacks a crucial nexus to Defendant's obligations under the contract, Plaintiffs' remaining assertions in this count fall short for the opposite reason: they are duplicative of those already going forward.  "[B]reach of the implied covenant is not an independent cause of action when the allegations are identical to other claims for relief under [an] established cause of action."  Wash. Metro. Area Transit Auth. v. Quik Serve Foods, Inc., 2006 WL 1147933, at *5 (D.D.C. Apr. 28, 2006) (citing Jacobsen v. Oliver, 201 F. Supp. 2d 93, 98 n.2 (D.D.C. 2002)).  To the extent that TIMM seeks to add these fair-dealing claims to buttress its breach-of-contract cause of action, then, it is impermissibly

"attempting to get two bites at the same apple."  Quik Serve Foods, Inc., 2006 WL 1147933, at *5.

More specifically, Plaintiffs never successfully identify the daylight between their good-faith-and-fair-dealing theory and their breach-of-contract theory.  In its Reply, TIMM characterizes the offending conduct as "saying one thing, and doing another," by "authorizing Plaintiffs to sell its products on Amazon.com, then terminating its Contract for doing so."  Pl. Reply at 14.  This is Plaintiffs' breach-of-oral-modification claim all over again.

TIMM dresses up the breach-of-notice provision slightly more by styling it as a "fail[ure] to reactivate Plaintiffs' account" once Defendant knew it was no longer in violation of the Internet Policy.  See Am. Compl., ¶ 73(c).  The analysis of this issue depends on which version of the Internet Policy applies; either way, Plaintiff does not prevail.  On the one hand, the fair-dealing count restates TIMM's breach claim under the original version of the Policy, which provided that an account brought into compliance after a violation "will be reactivated."  Policy Documents at 2.  Alternatively, it frames the fair-dealing problem as a failure to remedy Metagenics's breach of the revised Internet Policy, which has no such reactivation provision but allegedly requires that customers "have at least one opportunity to bring their website into compliance" before termination.  See Am. Compl., ¶¶ 44–45.  This version of the argument likewise duplicates TIMM's breach claim because declining to remedy a breach of contract is not appreciably different from breaching in the first place, and in any case does not qualify as "evading the spirit of the contract, willfully rendering imperfect performance or interfering with the other party's performance."  Hais v. Smith, 547 A.2d 986, 987–88 (D.C. 1988).  The Court thus finds Count III in its entirety alleged in vain.

3. *Count IV: D.C. CPPA*

Count IV of the proposed Amended Complaint puts a new twist on the case by invoking consumer-protection law. Specifically, TIMM seeks to put the D.C. CPPA to creative use by positioning itself — a distributor — as a "consumer" cheated by Metagenics's unfair trade practices.

The CPPA forbids a broad array of fraudulent and unfair business practices and grants an aggrieved "consumer" the right to "bring an action" for violations of its provisions. See D.C. Code §§ 28-3904, 28-3905(k)(1)(A). It defines "consumer," when invoked in noun form, as "a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services . . . or does or would otherwise provide the economic demand for a trade practice." Id. § 28-3901(a)(2). In adjective form, "consumer" is defined to include "anything, without exception" that "[a] person does or would purchase, lease (as lessee), or receive and normally use for personal, household, or family purposes." Id. § 28-3901(a)(2)(B).

TIMM zooms in on the only available statutory language that could possibly make it a consumer and ignores the rest of the statute. It argues that as a distributor of dietary supplements, it "provide[s] the economic demand for [Defendant's] trade practice." Pl. Reply at 7 (quoting D.C. Code § 28-3901(a)(2)). Unfortunately for TIMM, that interpretation of the statute has met with resounding disapproval. See, e.g., Adam A. Weschler & Son, Inc. v. Klank, 561 A.2d 1003, 1005 (D.C. 1989) ("If the purchaser is regularly engaged in the business of buying the goods or service in question for later resale to another in the distribution chain, or at retail to the general public, then a transaction in the course of that business is not within the Act."); Shaw v. Marriott Int'l, Inc., 605 F.3d 1039, 1043 (D.C. Cir. 2010) (explaining that

"read[ing] [the statute's] provisions together" reveals that "purpose is the touchstone of the CPPA's definition of 'consumer' and that the statute does not reach transactions intended primarily to promote business or professional interests").

Ignoring the consensus on this issue, Plaintiffs boldly call it "well-settled" that "the CPPA encompasses situations where merchants such as Defendant sell consumer products to distributors . . . who in turn sell the products to consumers." Pl. Reply at 7. But the case they rely on offers them no support. Raptors Are The Sol. v. Bell Labs., Inc., 2023 D.C. Super. LEXIS 6 (June 1, 2023), suggests only that a manufacturer of consumer products "cannot immunize its deception of consumers by selling its products via distributors." Id. at *11–12. In other words, Bell Labs teaches that Metagenics is a proper defendant under the statute but says nothing about whether TIMM is a proper plaintiff. The Court will therefore put this inventive cause of action to rest as well.

    4. *Count V: Fraudulent Inducement*

TIMM's final proposed add-on — a fraudulent-inducement claim — is the only serviceable one of the bunch. The Amended Complaint alleges that "[Metagenics's] agent . . . made a material false representation to Plaintiffs that they could sell [Metagenics's] products on Amazon.com, with the intent to deceive and knowing that such representation was false." Am. Compl., ¶ 86. That representation, in turn, "induced Plaintiffs into an oral modification of the Metagenics Contract." Id.

Under District of Columbia law, fraudulent inducement consists of: "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." Va. Acad. of Clinical Psychs. v. Grp. Hospitalization & Med. Servs., Inc., 878 A.2d 1226, 1233 (D.C. 2005)

11

(citation omitted). "Courts tend not to allow plaintiffs to allege fraudulent inducement alongside claims for breach because there is a risk of turning every breach of contract suit into a fraud suit . . . and of thwarting the rule that denies the award of punitive damages for breach of contract." Butler v. Ent. Integration Corp., 459 F. Supp. 3d 78, 96 (D.D.C. 2020) (cleaned up). Certain claims for breach qualify as torts nonetheless. For instance, a "promise or contractual commitment may be actionable as fraud (misrepresentation) if at the time of its making, the promisor had no present intention of carrying it out." Va. Acad., 878 A.2d at 1234.

Metagenics first suggests that this count relies on the "circular" logic that its agent "fraudulently induced Plaintiffs into accepting an oral modification of the contract by telling them falsely that the contract had been orally modified." Def. Opp. at 18. The Court is not convinced by this interpretation. In the District of Columbia, it is perfectly acceptable to raise fraudulent concealment where a promisor made "[a] promissory representation, or a representation as to future events . . . without the intent to perform." Va. Acad., 878 A.2d at 1234 (quoting Bennett v. Kiggins, 377 A.2d 57, 60–61 (D.C. 1977)). In other words, luring another into a contract by offering performance without any intention to render it is a cognizable tort. That is precisely what Plaintiffs have complained of here. See Am. Compl., ¶ 86 (alleging promise to allow TIMM's sales on Amazon was made "with the intent to deceive and knowing that such representation was false").

Defendant also maintains that these allegations are implausible because it would not have "knowingly deceived one of its own customers into violating the internet policy only so that it could turn around and terminate the customer's account," a result it would have "gained nothing" from. See Def. Opp. at 18. Again, this rebuttal comes to naught. After all, much the same could be said for Metagenics's refusal to reinstate TIMM as a customer after it stopped selling on

Amazon. That Defendant's alleged actions were conceivably ill advised for its bottom line is not enough to render them implausible. What is more, the requisite intent can be readily inferred from the circumstances. The contract termination occurred less than a month after the alleged oral modification took effect. In addition, instead of attempting to sort out its conflict with Plaintiffs, Metagenics purportedly cut off contact abruptly and without giving written notice as it was required to. See Am. Compl., ¶¶ 20–23; Va. Acad., 878 A.2d at 1234–35 (identifying "repudiation of the promise soon after it is made, with no intervening change in the situation" and "failure even to attempt any performance" as facts supporting inference of fraudulent intent) (quoting William L. Prosser & W. Page Keeton, Prosser and Keaton on Torts, § 109, at 764–65 (5th ed. 1984)). These facts are enough to "raise [TIMM's] right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007).

        The Court is thus satisfied that the addition of Count V is not clearly futile. It notes, however, that the parties have never raised the issue of whether the oral modification required or was supported by consideration. See Am. Compl., ¶ 52 (alleging that Metagenics agent "advised Plaintiff[s] that they could sell Metagenics products on Amazon" without specifying what, if anything, TIMM gave in return); Rinck v. Ass'n of Rsrv. City Bankers, 676 A.2d 12, 17 (D.C. 1996) (under common law, a "modification must possess the same elements of consideration as necessary for normal contract formation") (citation omitted); but see D.C. Code § 28:2-209(1) ("An agreement modifying a contract [for the sale of goods] needs no consideration to be binding."). This is of obvious relevance to breach, but is also important to fraudulent inducement because without a valid contract, "no claims requiring inducement to enter [that] contract can exist." In re U.S. Office Prods. Co. Sec. Litig., 251 F. Supp. 2d 77, 101 (D.D.C. 2003); see also Butler, 459 F. Supp. 3d at 95 n.3 ("[F]raudulent inducement . . . cannot succeed

absent the existence of an enforceable contract."). Elaborating on this issue may thus prove relevant at summary judgment.

B. Undue Delay and Prejudice

Having determined that the new proposed Count V constitutes a viable claim, the Court must now address whether it will nonetheless prohibit amendment because TIMM waited too long to add it.

Metagenics begins with several good points about undue delay. It rightly notes that Count V was not the product of newly discovered evidence, which means that Plaintiffs waited nearly 17 months after first bringing suit to tack on a cause of action they always knew about. See Def. Opp. at 9; compare Original Compl. (filed Apr. 18, 2022) with Mot. (filed Sept. 1, 2023). In addition, this is far from their first opportunity to add it, as this would be TIMM's fourth Complaint. See Def. Opp. at 2–7 (describing each iteration of the Complaint). The Court agrees that TIMM's behavior is hardly an optimal way to proceed in litigation.

Plaintiffs' dawdling does not win the day for Metagenics, however. That is so because "[c]onsideration of whether delay is undue . . . should generally take into account . . . the possibility of any resulting prejudice." Atchinson v. Dist. of Columbia, 73 F.3d 418, 426 (D.C. Cir. 1996). The showing of prejudice here is paltry. Defendant first frets that "the discovery period has already begun" and, as such, counsel has commenced with "gathering relevant information," work that it worries counsel "will have to repeat" while the "clock is ticking" under the already-issued scheduling order. See Def. Opp. at 11–12. It adds that, relatedly, the new claims "go well beyond what is currently before the Court" and will thus prevent Metagenics from "mount[ing] a credible defense . . . on the existing timeframe." Id. Finally, the

14

parties engage in an ancillary and seemingly irrelevant dispute about damages disclosures. Id. at 12–13; Pl. Reply at 5–6.

All of this appears to be much ado about nothing. As TIMM notes and Metagenics does not contest, no discovery has been propounded as of yet and the discovery schedule always contemplated the possibility of amended pleadings. See Pl. Reply at 4–5; Def. Opp. at 11–12; ECF No. 22 (Scheduling Order). More importantly, by allowing the addition of Count V alone, the Court will hardly expand the scope of the case for purposes of discovery. The only fact uniquely implicated by Count V is Defendants' intent in offering the oral modification, a modification already central in the prior allegation. Opening the aperture of discovery by a crack cannot possibly harm Metagenics when the exchange of information has not even started. Cf. Alston v. Cap. One Bank (USA), N.A., 2021 WL 7208901, at *1 (D.D.C. Oct. 27, 2021) (granting leave to amend where plaintiff delayed for months and discovery had closed because "allowing amendment would not necessitate significant further discovery," which could be reopened).

The Court is mindful that leave to amend should be "freely give[n]" when in the interest of justice. See Fed. R. Civ. P. 15(a)(2). Given such standard and the utter lack of prejudice Defendant will suffer, the Court will grant leave to add Count V.

**IV.   Conclusion**

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' Motion to Amend. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: October 13, 2023